In re CUMBERLAND FARMS,
INC., Debtor.

CUMBERLAND FARMS, INC., Plaintiff,

v.

Demetrios B. HASEOTES and CM
Acquisitions, Inc., Defendants.

Bankruptcy No. 92–41305–JFQ.
Adv. No. 95–4082.

United States Bankruptcy Court,
D. Massachusetts.

May 12, 1995.

Patrick Dinardo, Sullivan & Worcester, Boston, MA, for Cumberland Farms, Inc.

Stephen F. Gordon, Gordon & Wise, Boston, MA, for Demetrios B. Haseotes and CM Acquisitions, Inc.

## FINDINGS AND CONCLUSIONS

JAMES F. QUEENAN, Jr., Bankruptcy Judge.

At the conclusion of the trial in this case, I dictated findings of fact and conclusions of law into the record in conjunction with announcing the framework of a decree. I here supplement those findings and conclusions, and I also reverse a ruling with respect to the corporate opportunity aspect of the case.

The defendant Demetrios B. Haseotes ("Haseotes") recently formed the defendant CM Acquisitions, Inc. ("CM"). He thereafter purported to transfer his 100% stock interest in CM to his wife. By his own admission, he controls CM, and I so find. I also find he has a beneficial interest in the stock of CM.

Haseotes is a director of the plaintiff, Cumberland Farms, Inc. ("Cumberland"). Until November of 1988, Haseotes was Cumberland's chief executive officer, having held that position for many years. He was forced to resign as CEO by a major secured creditor. Haseotes, his two brothers and his sister, Lily Bentas, each own a 25% voting stock interest in Cumberland.

## I. CLAIM PURCHASES

Cumberland confirmed its chapter 11 plan of reorganization effective on December 31, 1993. The plan placed general creditors in Class 12. During the period between December, 1994 to March, 1995, CM acquired certificates representing the following Class 12 claims:

| Original Holder | Original Face Amount |
| --- | --- |
| Archer & Greiner | $ 45,850.95 |
| Shipman & Goodwin | 67,930.31 |
| Apter Industries | 28,220.61 |
| Glasgow Equipment Services | 20,661.78 |
| E.C.I. Atlantic | 4,335.47 |
| Marabella | 149,878.21 |
| Collier & Shannon | 76,346.69 |
| Davenport Travel | 8,243.90 |
| Lubrizol Corp. | 311,944.22 |

At the time CM acquired these claims, Cumberland had made partial payments on the claims pursuant to its confirmed plan of reorganization, so that the balance then due on the claims was less than their face amount. The price CM paid for the claims varied from 60% to 62% of the balance then due. The total amount of the Class 12 claims outstanding at the present time is approximately $17 million.

Cumberland's plan of reorganization provides for a 100% payment on Class 12 claims over a period of five years, but interest is not to begin until the fourth year, so that as of confirmation the value of a claim, even without applying a risk factor, was no more than 80% of the face amount of the claim. The plan provided for a board of directors whose majority would not be elected by members of the Haseotes family.

During the progress of the chapter 11 case, the Creditors' Committee indicated its displeasure with Haseotes. His sister, Lily Bentas, served as Cumberland's president during the case, and became Cumberland's chief executive officer upon confirmation of the plan. The Creditors' Committee favored Ms. Bentas as chief executive office. She will likely remain chief executive officer so long as an independent board controls Cumberland. The plan provides for the existence of the independent board until completion of all plan payments.

In the spring of 1994, Haseotes proposed to Cumberland that Cumberland engage in a program under which it would purchase all the outstanding Class 12 claims at a discount from their present value. Cumberland rejected the proposal because it believed the purchases would not be in the best interest of the company's financial health. During the summer of 1994, however, Cumberland did purchase a few claims held by certain suppliers. It did so in the belief these purchases would improve relations with those particular suppliers.

Prior to engaging in claim purchases beginning in November of 1994, Haseotes did not propose to Cumberland that it purchase

the claims which he later purchased. His proposal that Cumberland purchase claims was limited to the prior proposal involving a purchase of all Class 12 claims.

■ I conclude Haseotes in two respects has breached his fiduciary obligations as a director. First, he should have given Cumberland the prior opportunity to make these purchases. His previous proposal of a wholesale claims purchase program did not absolve him of the responsibility of bringing specific purchase proposals first to the attention of Cumberland to be sure that Cumberland did not wish to take advantage of whatever benefits these particular claim purchases might bring to it. A director's duty of disclosure is not so easily avoided. *Production Machine Co. v. Howe,* 327 Mass. 372, 99 N.E.2d 32 (1951) (director should have afforded his corporation, a manufacturer of polishing machinery, opportunity to acquire rights to saw sharpening machine); *Energy Resources Corp. v. Porter,* 14 Mass.App.Ct. 296, 438 N.E.2d 391 (1982) (third party's stated refusal to deal with corporation no excuse for failing to afford corporation opportunity to work out some arrangement with third party). Adding insult to injury, in making the purchases Haseotes employed the assistance of a Cumberland employee.

■ Second, the claim purchases were improper because Haseotes thereby intentionally placed himself in a position whereby he had a conflict of interest or, at the very least, a potential conflict of interest. *E.g., Schmitt v. Norcor Co. (In re Norcor Mfg. Co.),* 109 F.2d 407 (7th Cir.1940); *In re Philadelphia & W. Ry. Co.,* 64 F.Supp. 738 (E.D.Pa.1946); *In re Jersey Materials Co.,* 50 F.Supp. 428 (D.N.J.1943); *In re Los Angeles Lumber Prods. Co.,* 46 F.Supp. 77 (S.D.Cal.1941); *see also Manufacturers Trust Co. v. Becker,* 338 U.S. 304, 70 S.Ct. 127, 94 L.Ed. 107 (1949). This made it difficult for him to make future decisions on claims as a director free of his own personal interests as owner of claims. Adding to the conflict is the fact these purchases were made at a discount from present value. This brings into play a profit motive, accentuating his personal interests. *Id.*

■ Although Cumberland's business operations appear now to be going relatively well, Cumberland was at confirmation, and remains, unable to make immediate and full payment on its prepetition obligations. In other words, at confirmation Cumberland was insolvent in the equity sense, and it is in the same condition today. The purchase by a director of claims against his own corporation when the corporation is in such a financial condition, particularly the purchase of claims at a discount, places too much strain upon the loyalties of the director. *Id.* A corporation's weak financial condition makes it all the more important that its directors have no conflicting personal interest in any dealings on behalf of the corporation with those holding claims against the corporation. *Id.*

An indenture trustee holds security for the benefit of the Class 12 claimants and acts as disbursing agent for them. That does not solve the conflict problem. The trustee is bound to act in the interest of the Class 12 claimants. Under the trust indenture, the trustee is permitted to follow the directions of the holders of 25% of the Class 12 claims, as opposed to the directions of the postconfirmation creditors' committee. Thus if Haseotes becomes the owner of at least 25% of the claims, he would have a significant voice in any action taken on behalf of the holders of those claims.

I find that the purchases which Haseotes has made were accomplished with the intent of both making a profit and of eventually controlling actions on behalf of the Class 12 claimants. Haseotes wants to terminate the independent board of directors and become once again the chief executive officer of Cumberland. This further enhances his personal interests concerning the claims.

In *Manufacturers Trust Co. v. Becker,* 338 U.S. 304, 70 S.Ct. 127, 94 L.Ed. 107 (1949), a debenture trustee sought to equitably subordinate the excess of the face amount of certain bonds purchased by directors prior to the chapter XI proceeding over the purchase price they paid for the bonds. The Court recognized the danger of conflict of loyalties when a fiduciary makes such purchases, stating "the possibilities of a conflict of interest

for the purchasing director are intensified as the corporation becomes less a going concern and more a prospective subject of judicial relief." *Id.* at 313, 70 S.Ct. at 133. The Court cited with apparent approval decisions subordinating or disallowing claims purchased by an insider shortly before or during an insolvency proceeding. The Court nevertheless believed the conflict of interest thereby created should be "weighed against the desirability of permitting reinforcement of the insolvent's position insofar as a director's acquisition of claims may help." *Id.* It noted the debtor was not in the process of making settlements on its debt at the time of the claim purchases in question. *Id.* at 311, 70 S.Ct. at 131. It believed the purchases before it were not part of developing a "strategic position." *Id.* The Court concluded: "On this record the probability that an actual conflict of loyalties arose from the opportunity to purchase respondent's claims, while the debtor was a going concern, is not great enough to justify the exercise of equity jurisdiction." *Id.* But the Court limited the scope of its holding, stating: "[I]f it were fairly demonstrable, as a matter of experience, that a director free from all potential self-interest would be more likely to ... effect a debt settlement than one not wholly disinterested, a court of equity should explore such issues and not dismiss them out of hand. This decision is not meant to negative the relevance of these issues when raised on a proper record." *Id.* at 315, 70 S.Ct. at 133.

I here "explore" the ramifications of the conflict of interest created by the claim purchases in the present case. As stated, Haseotes made the purchases for two purposes—to profit personally on the claims and to aid his ability to terminate Cumberland's independent board of directors so that he could once again run the company. There was no need on the part of Cumberland to have the claims in so-called "friendly" hands. It is also significant that Haseotes made the purchases without prior disclosure to the board, and when the board learned of the purchase it voted to have Cumberland acquire the claims itself. Unlike the situation in *Becker,* Cumberland was operating under an arrangement with creditors because of its inability to pay its debts in full as they

matured. And unlike *Becker,* these purchases were "strategic." When all these circumstances are considered together, the conclusion is inescapable that the purchases were in violation of Haseotes' fiduciary obligation as a director not to place his own personal interests above those of Cumberland. The purchase simply placed too great a strain on his duty of loyalty to the corporation.

■ The usual remedy for the improper purchase of a claim at a discount by a fiduciary is to subordinate or disallow the claim to the extent its face amount exceeds the amount paid by the fiduciary. *See, e.g., Schmitt v. Norcor Co. (In re Norcor Mfg. Co.),* 109 F.2d 407 (7th Cir.1940), *cert. denied,* 310 U.S. 625, 60 S.Ct. 898, 84 L.Ed. 1396 (1940); *In re Philadelphia & W. Ry.,* 64 F.Supp. 738, 739 (E.D.Pa.1946); *In re Jersey Materials Co.,* 50 F.Supp. 428 (D.N.J.1943); *In re Los Angeles Lumber Prods. Co.,* 46 F.Supp. 77 (S.D.Cal.1941). Here, however, Cumberland's board has voted to purchase these claims for the amount paid by Haseotes less payments thereafter made on them. I will therefor order that such purchases be made.

Haseotes has received payments on these claims, but because of Cumberland's complaint he has turned that money over to the trustee for the Class 12 claimants. I will enter a decree ordering CM and Haseotes to transfer the claims to Cumberland for a cash price equal to the amount paid for the claims. The order will also direct the indenture trustee to pay to Cumberland the funds turned over to the trustee by Haseotes which represent the amount paid on the claims since their transfer.

## II. *HASEOTES' COMMUNICATIONS WITH EMPLOYEES*

■ Cumberland's complaint is not confined to these claim purchases. It also contends Haseotes is in violation of the provision of section 6.1(h)(9) of Cumberland's plan of reorganization, which provides as follows:

(9) Effective as of the Effective Date and until the Unsecured Creditors Note has been paid in full:

(A) The role of D.B. Haseotes in the day-to-day management of the Company will be limited to overseeing (i) the Company's interests in the Gulf Joint Venture and (ii) the Company's relationships with Vitol S.A., Inc. and with Newfoundland Processing Ltd. and refinery operations of such company.

██ Haseotes, by his own admission, has made numerous "strong suggestions" concerning Cumberland's day-to-day business to employees and members of management, including Cumberland's CEO, his sister Lily Bentas. Indeed, he has bombarded many members of management and employees with these "strong suggestions." Ms. Bentas has continuously protested these activities. So has the board. Despite this, Haseotes continued. He contends that because he holds no title in Cumberland, has no check-signing authority, and no authority to hire or fire employees, these activities are not in violation of the plan provision. I find otherwise. Except with respect to activities concerning the Gulf Joint Venture, Vitol S.A. and Newfoundland Processing Ltd., the intent and purpose of the plan provision was to eliminate all activities of Haseotes in the day-to-day operations of Cumberland so that, subject to those exceptions, his function would be restricted to the proper role of a director. His "strong" suggestions, moreover, are often considered commands by any employee other than his sister. A director has no management function apart from his participation in actions of the full board, except to the extent the board might delegate a function to him. Here, rather than delegate functions to Haseotes, the board has continuously protested his activities.

I will therefor enter an appropriate decree enjoining these activities. I conclude, however, that a decree merely enjoining such contacts with employees and management will not be sufficient. Haseotes will remain constitutionally unable to stay out of the day-to-day operating affairs of Cumberland if he continues to have an office in the building which houses the company's executive offices. Today's decree therefor also enjoins Haseotes from maintaining an office in the building. To facilitate Haseotes performing the proper functions permitted him by the plan of reorganization, however, the decree requires Cumberland to furnish Haseotes, if he requests, appropriate office space elsewhere.

## III. SUBORDINATION UNDER SECTION 8.3(c) OF PLAN

Cumberland also contends the claims purchased by CM should be subordinated pursuant to section 8.3(c) of the plan, which subordinates claims held by "any Holder of an Equity Interest or any person who is an affiliate of [Cumberland]" to the claims arising under the unsecured creditor's note. I am not persuaded the quoted language was intended to apply to Class 12 claims purchased by a Cumberland stockholder, or an affiliate, after confirmation. In any event, the issue is mooted by today's decree ordering Haseotes and CM to transfer the claims to Cumberland for the amount paid for them.

## IV. SOURCE OF FUNDS FOR PURCHASE OF CLAIMS

Another issue was obliquely raised during the trial. Cumberland requested, and I denied, permission to undertake discovery concerning the source of the funds CM used in purchasing the claims. Cumberland stated it suspected the funds came from the proceeds of a refinery sale which belonged to Cumberland. I denied discovery because that issue was not relevant to the pleadings in this case. Today's disposition is therefor not an adjudication of any cause of action concerning the ownership of these funds.

An appropriate decree has entered.

### DECREE

Cumberland Farms, Inc. (the "Plaintiff") brings this action against Demetrios B. Haseotes and CM Acquisitions, Inc. (the "Defendants") seeking injunctive and other relief. The court has conducted a trial and today has issued findings of fact and conclusions of law. In accordance therewith, it is hereby

ORDERED, ADJUDGED and DECREED, that

1. The Defendants shall forthwith transfer to the Plaintiff all Class 12 certificates acquired by them, or either of them, at a cash price equal to the price they paid for the certificates.

2. Demetrios B. Haseotes, his agents and servants, are hereby enjoined from:

(a) except for attending meetings of the Plaintiff's board of directors, entering the Plaintiff's premises without written authorization from the Plaintiff's president; or

(b) communicating with any officer or employee of the Plaintiff except

(i) as may be expressly authorized by the Plaintiff's president or board of directors; or

(ii) in connection with overseeing the Plaintiff's interests in the Gulf Joint Venture and the Plaintiff's relationships with Vitol S.A., Inc. and Newfoundland Processing, Ltd., and the related refinery operations.

3. The Defendants, their officers, agents and servants are hereby permanently enjoined from acquiring any further Class 12 certificates.

4. Shawmut Bank, indenture trustee for Class 12 claimants under the Plaintiff's plan of reorganization, shall forthwith pay the Plaintiff the amount paid it by the corporate Defendant, which amount represents sums the corporate Defendant received on certain Class 12 claims after it acquired the claims.